RENSSELAER OYER AND TERMINER. May 1854. Before *Harris,* Justice of the Supreme Court and the Justices of the Sessions.

### THE PEOPLE vs. HENRIETTA ROBINSON.

It is no defence to an indictment for murder, that the prisoner was intoxicated at the time of the commission of the offence. The law holds a person responsible for a criminal act, though, at the time, he was intoxicated to such an extent as to be unconscious of what he was doing.(a)

Where insanity is interposed as a defence, its evidence must be established by affirmative proof, every person being presumed to be sane till the contrary is proved.

The existence or want of motive to commit the crime alleged is always a legitimate subject of inquiry. The weight to which such evidence is entitled in different cases stated and discussed.

The prisoner had been indicted for the murder of Timothy Lanagan by poison, and pleaded not guilty. The cause was brought to trial at the Oyer and Terminer held at Troy in the county of Rensselaer, in May, 1854. The facts of the case, as proved on the trial, are sufficiently stated in the charge to the jury.

*R. A. Lottridge,* (Dist. Att'y,) and
*H. Hogeboom,* for the People

(a) See Rex v. Patrick, 7 Carr. & P. 145; McDonough's Case, Ryan's Med. J. 294; 1 Beck, Med. J. 627; U. S. v. Drew, 5 Mason, 28. *Aliter* in Penn. Com. v. Dunlap, Lewis, Cr. L. 394, 405.

*Wm. A. Beach, M. I. Townsend* and *Job Pierson,* for the prisoner.

At the close of the trial the following charge was delivered to the jury by the presiding judge:

Gentlemen of the Jury: The scene which during the week has occupied your attention with such painful interest, is at length drawing to a close. Happily, it is rare that the citizen in the discharge of the duties which he owes to the government under which he lives, is called upon to act under responsibilities like those which devolve upon you. It is but once, perhaps, in the course of a man's life, that he is called upon to decide the fate for life or death, of a fellow being, when, in the impressive language of the ceremony which initiated you into your office as jurors, the life of a fellow creature is given in charge to twelve men. The prerogative to determine life belongs to the source of life itself. It is the highest power that man, himself the subject of mortality, can exercise, to assume this prerogative and declare the life of his fellow man forfeited. This fearful responsibility rests upon you. When you entered that sacred place, you, each for himself, took a vow upon yourselves that you would render a true verdict according to the evidence, even though the effect of that verdict should be to take the life of the accused. That obligation you are now to meet; let it be so met that a peaceful conscience may attend the abiding recollections of this hour, and, whatever may be the fate of this unhappy woman, that you may ever possess the conscious assurance that the laws under which you live and from which we all receive protection, have been faithfully upheld and impartially administered.

With the policy or wisdom of the law which demands life as the penalty of crime, neither you, as a jury, nor we, as a court have anything to do. Were we sitting as legislators, it might become us to express our opinion on this subject; but placed here, as we are, to administer the law, it is our duty to

The People *v.* Robinson.

take it as we find it. The responsibility of taking human life is not upon us but upon the lawgiver.

I proceed now, as briefly as I may, to invite your attention to the questions which will demand your anxious consideration, and the prominent points of the testimony bearing upon those questions.

Timothy Lanagan died on the 25th of May, 1853; he died of poison; was this poison administered by the accused? This is the first question which will require your attention. If the evidence fails to satisfy you of this fact your duty will here terminate. You will pronounce your verdict of acquittal without reference to the other questions in the case.

But I have not understood the counsel for the defence as contending that the evidence justifies such a conclusion. The accused was in possession of the article which upon the *post mortem* examination was found in the stomach of Lanagan. Some ten days or a fortnight before, she had purchased of Mr. Ostrom, the druggist, two ounces of arsenic. About one o'clock on the day of the death she went into Lanagan's house, where she found the family, Lanagan, his wife and Catharine Lubee at dinner. She sat down, upon invitation, to eat an egg and a potatoe. Soon after, Lanagan left the table and went into the grocery in the front room of the house. The accused then proposed to Mrs. Lanagan and Miss Lubee, to use the expression of the witness herself, that they should drink beer from her. They at first declined, but being urged they at length consented. She then proposed, in order to make the beer more palatable, to put sugar in it, and requested Mrs Lanagan to procure it. Mrs. Lanagan, yielding to her request, procured from the grocery some fine white sugar in a saucer She then went back to get the beer, leaving the accused and Miss Lubee in the room. When she returned she found the accused walking the room with the saucer of sugar in her hand, and she also says she observed that she held in her thumb and finger a small white paper folded. Two glasses were provided and the beer poured out. There was not enough to fill them. The accused insisted that they should be full. Mrs. Lanagan

returned to the grocery for more beer. When she went back the accused was putting the sugar into the glasses. They were filled, and Mrs. Lanagan and Miss Lubee sat down at the table to drink. Mrs. Lanagan says she observed upon the surface of the beer a white scum, and thinking it might be dust that had fallen upon the sugar while standing in an open box in the store, she took a tea-spoon to remove it—that while in the act of doing so, the accused, who was standing by arrested her hand and took the tea-spoon from her, saying that was the best part of it and that it would do her good. At that moment Mrs. Lanagan was called to the grocery by her husband. She remained there, but her husband came and he and Miss Lubee drank the beer. He died at seven o'clock the same evening, and Miss Lubee died at four o'clock the next morning.

This branch of the case depends entirely upon the testimony of Mrs. Lanagan. From the nature of the case there could be no other evidence. Had she imbibed the fatal draught instead of her husband, as was at first intended, there would have been no one left to detail the circumstances. The credibility of Mrs. Lanagan has not been questioned. If her story is to be believed, it would seem to leave no room for doubt. You can not hesitate, however painful it may be, to come to the conclusion that it was the accused, and no one else, who administered the arsenic which produced the death of Lanagan.

Assuming that your mind will be brought to this conclusion, I proceed to bring your attention to another important inquiry —an inquiry which from its very nature is far more difficult. That inquiry is, whether, at the time she committed the act, the accused was in a condition to render her *legally* responsible for crime—and this depends upon the question whether, at the time, she was in a state of mind which enabled her to know that what she did was *wrong*. If at the moment of mingling that cup she knew that she was doing wrong and deserved to be punished for it, then, whatever else there may be in the case, before the law she is answerable for the act as a crime. The evidence of her conduct before and after is of no importance except as it reflects light upon her condition at the fatal hour

when she committed the deed for which she is now before you to answer.

It seems that, about the period in question, the accused had indulged very freely in the use of intoxicating drink. Mr. Ostrom says that when she was at his store on Saturday evening, which must have been the 21st of May, she was quite intoxicated. Mr. Brownell says that when she came to his office in the early part of May, he thought her the worse for liquor. Mr. Cox says she frequently purchased liquor at his store, sometimes taking it there, and sometimes taking it home with her. Mrs. Lanagan says that, early in the morning of the 25th of May, she came to the grocery and procured a quart of beer, which she took home with her; and as the deceased was living alone, it may be presumed that she applied it to her own personal use. At 8 o'clock she sent old Mr. Haley to borrow $2 of Mrs. Lanagan, and before he left she came herself. About eleven o'clock she was there again. It is not proved that she drank then, but she went into the room back of the grocery, where there were several men, and engaged in noisy, boisterous conversation. The fact that she was found in such a place, and in such company, furnishes some ground for the belief that she was then under the influence of liquor. Mrs. Lanagan says that perceiving the noise she went into the room and told her to go home—that it was no place for her to be there among such a set of men. At one o'clock she came again, and then the poison was mingled with the beer. Shortly after she left, she sent Haley for Mrs. Lanagan to come to her house. It is the theory of the prosecution that, having failed in procuring Mrs. Lanagan to drink the poison, it was her object to get her over to her house, so that she might yet execute her purpose. But of this, of course, there is no proof. About 3 o'clock she was at the grocery again and asked for beer. Mrs. Lanagan says she told her she did not need any, and declined to let her have it. The answer and the conduct of Mrs. Lanagan at this time, indicate pretty strongly, I think, the condition in which she was at the time; or, at least, what Mrs. Lanagan, thought of her condition. While there, Lan-

agan came home sick, and Miss Lubee had already taken to her bed.

Upon this state of facts, the question presents itself whether, at the time she committed the fatal deed, the accused was intoxicated? That she was greatly excited there is no reason to doubt. This is sufficiently evident from the fact of her having visited the grocery so frequently. That she drank freely, is, I think, also evident. Was she, then, intoxicated?

It is my duty to say to you, gentlemen, that, if she was intoxicated, even to such an extent that she was unconscious of what she was doing, still the law holds her responsible for the act. It is true to constitute the crime of murder there must be killing of a human being with a premeditated design to effect death. But this design need not be proved. Where the act is committed the law imputes the design. It proceeds upon the sensible principle that a man may reasonably be presumed to intend to do what he in fact does. Thus, if a man will draw from his pocket a pistol and deliberately shoot down a fellow man, the law, without further proof, adjudges that it was in his heart to kill him. If he would excuse himself he must show affirmatively that he had no such guilty purpose. Then, and then only, can he be exonerated from guilt. If it appear that by the inscrutable visitation of Providence the faculties of his mind had become so disordered that he was no longer capable of discriminating between right and wrong in respect to the act he has committed, then the law, in its justice, pronounces him innocent of the crime. But, if his derangement is voluntary; if his madness be self invited; the law will not hear him when he makes his intoxication his plea to excuse him from punishment.

If, then, the accused mingled poison in the beer that was drank by Lanagan, the law charges her with a design to kill him; and though she may have been excited by drink at the time, even to such an extent as not to know what she was doing, she must answer for the consequences. Her self-inflicted insanity must not be allowed to avail her for defence. The law imputes to her still a *murderous intent.*

The People *v*. Robinson.

But it is urged, in behalf of the defence, that the accused was not merely intoxicated; that she was, in fact, insane. If this be so—if by the visitation of God she was so bereft of reason as to be unconscious of the character of the act she was committing, there is an end of her accountability. But before you can allow this ground of defence to prevail, you must be satisfied of its existence by affirmative proof. Every person is presumed to be sane. When the contrary is asserted it must be proved. The presumption of sanity must be overcome by satisfactory countervailing evidence.

Upon this branch of the case, it is your duty to examine the facts in the case with the most diligent care. And here the question of motive may well be considered. It has been urged by the counsel for defence that there could have been no possible motive for destroying the lives of Lanagan and Mrs. Lubeè; and that the absence of motive furnishes a strong ground for inferring that the act must have been committed in a state of insanity. The existence or want of motive to commit the crime alleged is always a legitimate subject of inquiry. In cases depending upon circumstantial evidence it is sometimes of vital importance. But it is never indispensable to a conviction that a motive for the commission of the crime should appear. The law imputes malice to the act so that the very proof of the killing furnishes also presumptive evidence of malice. And yet, while the prosecution is relieved, by this legal presumption, from proving an actual motive for the commission of the offence, the absence of such proof is often an important consideration for the jury in determining the effect to be given to the other evidence in the case.

But it is contended, on the part of the prosecution, that there is proof of a state of feeling, which, considered in connection with the state of mind exhibited by the accused at about the period in question, relieves the case of this objection. It appears that some time during the spring there had been a dance at Lanagan's. Though not one of the party, the accused went there and became engaged in an altercation with one Smith, and angry words and loud conversation ensued. If it

be true, as has been assumed throughout the trial, that the accused is of gentle birth and has once moved in the higher and more refined walks of life, what a painful illustration she presents of the rapid descent which a woman makes to the lowest depths of degradation and vice, when she once consents to take leave of virtue and innocence! Here we have this fallen woman, who is described to us as possessing high accomplishments and lady-like manners, voluntarily mingling with the parties to a grocery dance, engaging in a brawl with one of the party, and carrying the quarrel so far as to present her revolver and threaten to shoot him. To quell the disturbance she was required to leave the house, and finally Mrs. Lanagan led her home. This occurrence seems to have stung her pride, for, one or two mornings after, we find her returning to the grocery, before Lanagan was out of bed, and she then, as Mrs. Lanagan says, commenced abusing her: saying that she was a very mean woman to keep a set of rowdies about her house to insult her when she came there. Her language was so loud and violent that Lanagan got up, and, coming into the grocery, ordered her to leave, which she refused to do, until Mrs. Lanagan again interfered and induced her to go home.

The result of this quarrel was, that she did not again return to Lanagan's for some three weeks, after which she again renewed her visits. It is the theory of the prosecution that these occurrences left a sting rankling in the bosom of this woman, which needed but the excitement of which she was the subject on the 25th May, to arouse her to such a degree as to make her resolve upon the destruction of those who had become the subjects of her resentment. Certainly, these circumstances would furnish to a sound mind but a slight motive for the commission of such a crime. How far they would operate upon an irascible temperament like hers, when greatly excited by stimulants, and, perhaps other vitiating causes, it is for you, gentlemen, to judge.

There is another feature of this case, which may have some bearing upon the question under consideration, to which I would direct your attention. It is the manner in which the

deed was accomplished. We see no outburst of passion, but everything is apparently cool and orderly. First, the proposition to drink the beer, and that insisted upon; then, obtaining the sugar, the arrangements to mix the poison with it, while the glasses were being filled; then the refusal of the accused herself to drink, and her efforts to prevent any of the contents of the glass from being removed. These are characteristics which may, perhaps, shed more light upon the state of this woman's mind at the time.

There is another class of evidence bearing upon the question of insanity, to which you will not fail to give the attention which you think it deserves. I allude to the conversation of the accused a short time previous to the 25th of May. This evidence is found chiefly in the testimony of the young sewing girl, Mary Jane Dillon, who became acquainted with her in March previous. The testimony of Anthony Goodspeed belongs to the same class. I will not recapitulate this evidence. It can not but be fresh in your memories. There certainly must have been in the statements made to Miss Dillon, a strange commingling of truth and falsehood; the latter predominating. Whether the tales she told were the vagaries of a distempered imagination, or the inventions of her fancy, designed to amuse her youthful and newly acquired friend, it is for you to enquire. There was, too, something exceedingly strange at times in her conduct; especially when in the morning she came in her night clothes to the residence of Miss Dillon and borrowed her dress. It will be your duty to satisfy yourselves as to the state of mind to which this conduct is to be attributed.

It certainly was not strange that the accused and this young girl should be mutually pleased with each other. The accused, with an ardent temperament which demanded society, was so situated that she was compelled to live alone. She had sought companionship among those who had no tastes or sympathies with her own, and whom she regarded, probably, with contempt. It was a relief to her solitariness, therefore, to meet with Miss Dillon; a young, artless, imaginative girl, with whom she could at least talk. There was much, too, in the

air and manner and romantic stories of the accused, to please the taste for romance which this young girl seems to have possessed. She says she was pleased with her conversation, though she admits that her ear was sometimes offended by expressions both of profanity and obscenity. How far the testimony of this girl tends to establish the defence, is for you to consider. It is upon this testimony, supported, as it is, by some other kindred but less important evidence, that the counsel for the defence chiefly rely.

The theory of the defence is, that the accused had become apprehensive that she was about to be abandoned by one who had been her friend and supporter, and that this apprehension operating on her nervous, excitable temperament with the recollection of her own former position, from which she had so sadly fallen, had unhinged her mind, and that the eccentricities which marked her conduct about the period to which our inquiries relate, were but the outbursts of incipient madness. To sustain this theory the testimony of Mr. Brownell was introduced, to whom, it seems, early in May, the accused had described her griefs and apprehensions.

Thus far I have only noticed the testimony which relates to occurrences which happened before the arrest of the accused. What her conduct was afterwards is only important as it sheds light on her previous condition. Her conduct after she was committed to prison was indeed strange. How far this conduct was produced by the enormity of the charge preferred against her, and a sense of the condition in which she found herself; and how far by being suddenly deprived of the stimulants in which she had evidently been indulging so freely; or how far by disordered intellect; are questions which I suggest for your consideration. In this connection, too, it will be proper to consider the opinions of the two physicians who had the opportunity of seeing her in jail, and who say that, in their opinion, she was not rational. Such opinions are allowed to be given in evidence, not as by any means controlling your own opinions, but to be considered by the jury, who are to give them such weight as, in their judgment, having regard to

The People *v.* The Sheriff of Westchester County.

the experience and opportunities for observation which those who express the opinions have enjoyed, such opinions deserve.

And now, gentlemen, I have noticed what I regard as the principal points and features of the case before us. I have not thought it fit to review at length the evidence presented, as I am sure that it is all fully within your recollection

Here my duty ends and yours begins. I am conscious how imperfectly I have discharged my duty, and yet it has been my single aim to administer the law with a steady and unswerving hand. In the discharge of your duty, be faithful to your own high obligations. Deal justly with this poor, unhappy woman, whose destiny is now committed to your hands. Deal mercifully with her, too. This is your privilege. The law allows every well-grounded doubt to avail for her acquittal. If, after a full consideration of all the facts in the case, no such doubt rests upon your minds, you must not hesitate, though it be with anguish of heart, to pronounce her guilty. But if you can, after all, say that you are not satisfied of her guilt, it will be your agreeable duty to pronounce a verdict of acquittal.

The jury found the prisoner guilty.

---

SUPREME COURT. At Chambers, New York, September, 1852. Before *Edmonds*, Justice.