## James Preston v. The State.

1. **Jury Oath in Capital Cases.** — The jury oath prescribed for capital cases by the act of 1843 (Pasc. Dig., art. 3990) was abrogated by art. 563 of the original Code of Criminal Procedure, which provided the form of oath to be administered in all criminal cases, without distinction.

2. **Same — Practice.** — A defendant has no right to require that the oath administered to the jury shall be set out in the judgment-entry. If a wrong oath was administered, a bill of exceptions is a proper method of authenticating the fact.

3. **Circumstantial Evidence.** — When the inculpatory evidence is circumstantial in its nature, any fact, however unimportant in itself, which tends in the least degree to establish the guilt or innocence of the accused, is

competent evidence. In such cases, therefore, incidents may be legitimate evidence which would be deemed irrelevant in a case dependent on direct and positive testimony.

4. SAME. — Evidence showing that the defendant had a motive to commit the crime is never indispensable to a conviction, though such proof is sometimes of great importance in cases dependent on circumstantial evidence.

APPEAL from the District Court of Cooke. Tried below before the Hon. J. A. CARROLL.

This is the fifth and last of the series of appeals to this court from convictions for murder in the first degree resulting from the midnight massacre of William England, his wife and two of her children, on August 26, 1876. It is the second appeal of Preston from convictions in the District Court of Cooke County, to which the venue of the cause was changed from Montague County, in which the savage tragedy was enacted. A report of his first appeal will be found at page 186 of volume 4 of these Reports.

In the opinion rendered in the present case will be found a comprehensive recapitulation of the most significant and material facts and circumstances adduced in evidence at the trial in the court below. In detail the testimony is reported in the case of A. K. Taylor, 3 Texas Ct. App. 169, and in the case of Ben Krebs which immediately precedes the present case in this volume, — except certain additional facts peculiar to this case and disclosed in the opinion. From these several reports it will be seen that, notwithstanding the lapse of nearly six years since the appalling assassination of the England family, and despite the most strenuous efforts of able and experienced counsel, retributive justice has consigned the two adult defendants to the gallows, and Taylor, the minor, to the penitentiary for life; three juries of Cooke County and two of Montague having concurred in finding them to be the perpetrators of perhaps the most horrible assassination imputed to civilized men of the present generation.

*Grigsby & Willis, Hurt & Williams, W. J. Sparks*, and *Crawford & Smith*, for appellant.

*Thomas Ball*, Assistant Attorney-General, and *Thomas W. Dodd*, for the State.

CLARK, J.   From a second conviction for the murder of Selena England the defendant James Preston has again appealed to this court, and asks that a new trial be awarded him.   Upon his former appeal, the judgment of conviction was declared invalid because of a refusal of the court below to grant him a continuance on account of the absence of material witnesses in his behalf, and because upon his trial illegal evidence was admitted against him over his objection.   4 Texas Ct. App. 186.   Numerous errors are again assigned and discussed in his behalf upon this appeal; but, upon examination, many of them are found unsupported by the record, and others still not supported by the law.   It is not necessary that we discuss all of them, and such as are not noticed may be dismissed with the remark that they are not well founded, or are so immaterial as not to require more extended notice.

Even before the revision of the Code there was no distinction between capital felonies and other criminal cases in the manner of swearing the jury and the form of the oath proper to be taken, the act of May 4, 1846 (Pasc. Dig., art. 3990), having been superseded by the adoption of the original Codes in 1856.   *Tickle* v. *The State*, 6 Texas Ct. App. 623; *Clampitt* v. *The State*, 3 Texas Ct. App. 638.

The court was not required, even though the same was demanded by the defendant on trial, to alter the form of its judgment-entry in order that the exact oath administered to the jury should be set out *in hæc verba;* and its refusal so to do did not deprive the appellant of any right, for the whole proceeding, including the very words of the oath, is made to appear in a bill of exceptions as fully and completely as if incorporated in the judgment-entry.

Nor, after a very critical examination of the numerous bills of exception relating to the admission of testimony over appellant's objection, are we prepared to say that there was any departure from the law in these rulings, nor that they are not fully sustained and sanctioned by repeated adjudication of this and other courts. As has often been said, in cases of this character the mind seeks to explore all possible sources of information and demands the introduction in evidence of every fact, no matter how unimportant in itself, which may tend in the slightest to elucidate the mystery surrounding the transaction and to make manifest the guilt or innocence of the accused on trial. It may be said, not inappropriately, that in cases like this, when a foul assassination has occurred and the circumstances attending and surrounding it are shrouded in mystery, the command of the law is, "Turn on the light." In such cases the rules of evidence are not to be disregarded nor set at naught to subserve a special exigency, but from necessity and in the interest of public policy and public justice it is always permissible to array in evidence facts and incidents remote and even unimportant in themselves, and which, in cases depending upon direct and positive testimony, would be generally regarded as irrelevant.

The acts and declarations of appellant's co-defendant, Krebs, as well as the occurrences which took place at Krebs's house after the homicides and the arrest of both, were, in so far as the acts are concerned, independent evidence; and the declarations of Krebs's wife were concomitant with the search made of his house, and so inseparably connected therewith as to make their segregation almost impracticable. Besides, these declarations were carefully guarded and restricted in the charge of the court to the single issue of her impeachment, and the jury were expressly forbidden to consider them for any purpose save this; and they were further cautioned that they could not consider the acts, declarations, or deeds of Krebs as incul-

patory facts against the appellant unless he was present and sanctioned them, or unless a conspiracy between them was established by the evidence.

The repeated statements of Mrs. England, the deceased, as to the circumstances attending the murder, come clearly within the rules of dying declarations, and the evidence fails to show, with any degree of certainty and satisfaction, the existence of any authentic written statement which would preclude the admission of oral testimony as to what these declarations were. Whart. on Hom., sect. 766.

The only point presented by the record which seems to call for special consideration and discussion is the sufficiency of the evidence, and to this we have addressed ourselves with earnest care, realizing the full responsibility of our solution both to the law on the one hand and the citizen on the other. We have undertaken to divest ourselves entirely of that sense of horror which must come over every mind not utterly lost to the impulses of a common humanity, when brought face to face with the horrid transaction which forms the basis of this prosecution, and, gleaning from the record before us all the inculpatory facts which may point to this appellant as a guilty participant in this deed most diabolical, to view them from the stand-point of human intelligence, and answer the question, "Is the appellant proven guilty under the rules of law?"

These inculpatory facts may be classified into two separate divisions: first, such facts as show the guilt of Krebs, the co-defendant of appellant, and connect appellant with him; and second, independent facts which may tend to show that the homicide was perpetrated by parties at Krebs's house, including appellant.

No candid mind can review and contemplate the evidence submitted in the record before us without reaching a conclusion beyond a reasonable doubt that Ben Krebs was present at the assassination of the England family, and a guilty participant therein to the extent of murdering with

his own hands two helpless and inoffensive women.  Apart from the outcries of Susie Taylor when pursued and mortally wounded by the relentless assassin, and which with her dying breath fixed the identity of Krebs, furnishing another illustration of that decree of an inscrutable Providence which hath ordained that "murder will out," her stricken and dying mother, under a like dispensation, was permitted to drag her dying body, in the dead watches of the night, to the friendly refuge of a neighbor's house, distant one-half mile from the scene of the assassination, and there recount its circumstances and fix the identity of at least one of its perpetrators.  Nor was this all; her frail existence was protracted sufficiently long to enable the officers of the law and outraged citizens to carry her back to her desolate home, there to recount again the horrid details, and to face Krebs and charge him as the murderer.  In all these statements made by her previous to her death, there is "neither variableness nor shadow of turning" as to Krebs.  She did not recognize the other two assassins distinctly, but Krebs she saw and recognized beyond doubt, and him she reiterates on each occasion as a guilty party.  When brought into her dying presence, he answers her charge by saying that it must be her imagination; and then she gives in detail her means of information, and how it was impossible for her to mistake him.  His voice as it uttered its horrid curses, his beard, his hat, and her immediate proximity to him, — so close that she could have put her hand upon him, — are all stated with vivid recollection and exactness, and convey to the mind at once a profound impression of the honesty and certainty of her convictions.  These murdered women testify that Krebs was there, although their lips are sealed in death; and this testimony is at least as convincing as if made upon the witness-stand, and under the sanction of an oath.

Was the appellant with him on that fatal night?  Who can doubt it!  From his own lips comes the confirmation.

On the day succeeding the murders, he asserts the presence of Krebs at his own home all the preceding night, and that he himself was with Krebs during the whole night. And again in his motion for new trial he solemnly and under the sanction of an oath reasseverates the fact. If Krebs was present at the house of William England at the time of the murders, then the appellant was there also; and the testimony shows, as conclusively as human testimony can show, that Krebs was there. This, of itself, might suffice; but this is not all.

Turning to the other branch of the inquiry, we find that the footprints of two persons, corresponding in general size and appearance with the footprints of Preston and Krebs, which evidently had pursued the murdered woman around the yard, the cotton-patch, and the cow-pen, bore off in the direction of Krebs's house, and having been joined by those of another person, are traced to the immediate vicinity of his house. One of these tracks was apparently made by a shoe slightly run down at the heel, and such a shoe is found upon Krebs. It is shown that Preston, Krebs, and one A. K. Taylor, who is now undergoing a life-sentence in the State penitentiary for this identical series of murders, were the only adult male persons at Krebs's house on that night, and that Preston had been boarding or staying with Krebs for some days, as was his custom when in that vicinity. For the defence, it was attempted to be shown that neither of these tracks were made by a half-soled shoe, and that Preston, the appellant, had on shoes of that character on the night in question. But there is evidence tending to establish the fact. that the half-soles were placed on his shoes after he had been confined in jail.

Krebs's house was, it appears, the nearest house to that of William England, and it is testified for the defence that its inmates heard the shooting and got up from their beds, but did not go over to England's or send to ascertain the cause; nor did any of them go to the house of England until

a late hour on the succeeding morning, after many persons had already congregated there, and then only Krebs and Preston went.   On their arrival, and previous to their arrest, their demeanor and acts, especially those of appellant, were not free from suspicious embarrassment; and one witness testifies pointedly to the palpable agitation of the appellant before he was informed that suspicion pointed to him as a guilty party.   This, of course, is a fact of but little moment, considered alone, but not devoid of significance when taken with all the evidence in the case.

It was stated by Mrs. England in her dying declarations, that when Krebs was pursuing herself and her daughter in the yard, she heard the outcries of her husband in the house, and on rushing to his aid she found him seated in a chair, with his head bent back, and some person, resembling in size and general appearance the appellant, whom she took to be either the appellant or a Dutchman who had stopped at her house that day inquiring for Krebs's, was cutting his throat.   The Dutchman was arrested and brought into her presence before her death, and without hesitation she said he was not the man, and he was discharged.   When arrested at the house of England, on the day after the murder, the shirt worn by appellant was apparently stained in several places with blood, and the appearance of the spots indicated a recent attempt to wash them out.   It was noticed also that the pants worn by appellant were wet " up to the crotch," as stated by one witness, although the weather was rather dry.   It was shown also in evidence that on the day of the murder Krebs went to the town of Montague wearing a clean shirt, and on the succeeding day he appeared at the scene of the murder wearing a shirt thoroughly soiled, and apparently as if it had been worn for several days.   On the day after his arrest, which was two days after the murder, his house was searched, and a shirt bearing upon it stains as of blood was found concealed in the loft or garret of his house.   These spots were subjected to some sort of test by

a physician, who gave his opinion on the trial that they were human blood; but the test was not of a very satisfactory character, and there was evidence given in by members of Krebs's family that a day or two before the murder Preston had killed and brought in some wild turkeys, and Krebs had dressed and prepared them for cooking. Ill-feeling between Krebs and his family and the persons slain is testified to, but its nature, origin, or particulars do not appear in this record at least.

This is a brief recapitulation of the salient facts in evidence upon which the guilt of appellant and his conviction must be sustained. Regarding them in their most favorable light for him, we cannot say that they fail to produce in our minds a conviction that appellant participated in this murder as a principal in law, and that beyond a reasonable doubt. If these facts be true, — and we must assume their verity, in view of the finding of the jury, — they are absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of guilt.

It is true that no motive on the part of appellant to commit this crime is shown, but it is never indispensable to a conviction that a motive for the commission of crime should appear. *The People* v. *Robinson*, 1 Park. Cr. 655; Roscoe's Cr. Ev. 88. Who with mortal ken can fathom the human heart and expose all its mysterious promptings? Crimes the most horrible are often committed without apparent motive save an insatiate deviltry which mocks at social restraint and recklessly defies the laws of God and man. While in cases depending upon circumstantial evidence the existence or want of motive is sometimes of vital importance, yet the vindication of the law is not made to rest upon so narrow and frail a foundation, nor can the demands of justice be met and foiled by an averment that no motive for the prisoner's conduct has been made to appear. That Krebs had a motive to destroy the England

family may be gathered from the testimony ; and this is not the first time, and will not be the last so long as human nature remains the same, that the promptings and seductions of an evil and malicious heart may contaminate those around it, and induce and influence them, from motives of friendship or of gain, to join in the execution of an unholy purpose, for its own sole benefit.

Under an instruction which required them to be satisfied, not only beyond a reasonable doubt, but to an absolute certainty, that the defendant was guilty upon the evidence, a jury of his own selection have said by their verdict that he is guilty. Possibly he may be innocent, but from a human stand-point, and in the light of human law and human evidence, we cannot say that the jury have erred in their finding, and that under the law the appellant is entitled to have their verdict set aside. Appreciating to the fullest extent the grave consequences which must result from our action, and our own responsibility to the law, we can reach no other conclusion than that the appellant is guilty under the law, and should suffer its penalty.

The judgment is therefore affirmed.

*Affirmed.*