Casat v. The State.

---

## CASAT VS. THE STATE.

1. CRIMINAL PRACTICE: *Objections to juror.*
   Objections to a juror for having formed and expressed an opinion of the prisoner's guilt come too late after the verdict, unless upon proper examination as to his qualifications as a juror he has by concealment or prevarication imposed himself upon the panel.

2. CIRCUIT COURTS: *Their discretion in admitting evidence.*
   In the order of the production of evidence Circuit Courts have a large discretion which will not be controlled by this Court so long as they admit only legal and exclude only illegal evidence.

3. CRIMINAL EVIDENCE: *Threats as evidence of malice.*
   Declarations of defendant in the nature of threats made before the alleged murder are admissible in proof of malice; their weight

Casat v. The State.

depending upon their nearness or remoteness in time and his intervening conduct.

4. DRUNKENNESS: *As a defense for crime:*

No voluntary intoxication can reduce murder in the first degree to a lower degree of homicide, unless it is accompanied by a temporary destruction of reason. Mere nervous excitement from drinking is not sufficient.

5. INSANITY: *As a defense for crime: Burden and degree of proof.*

When insanity is set up as a defense for crime, the defendant must clearly prove that at the time of the act he was laboring under such a defect of reason, from disease of the mind, as not to know the nature of the act he was doing, or if he did know it that he was ignorant he was doing what was wrong. The same test applies to the defense of drunkenness. (Eakin, J., dissenting as to the degree of proof required of defendant.)

6. MURDER: *Deliberation: When it must exist to constitute murder in the first degree:*

It is a more accurate expression of the law and less liable to mislead, to describe murder in the first degree as an act done *after* deliberation than *with* deliberation. If the resolution to kill be formed deliberately and with premeditation, it cannot reduce the grade of the offence, that at the time of the killing the defendant was in a passion, or laboring under excitement.

APPEAL from *Pulaski* Circuit.

Hon. F. T. VAUGHAN Circuit Judge.

*E. W. Kimbell, R. A. Howard* and *R. C. Newton* for appellant.

1. There was no testimony to sustain the hypothesis that appellant made himself drunk for the purpose of killing Barnes or any one else. 1 *Duval,* (*Ky.*) 224.

2. The second instruction was misleading. *Wharton's Cr. Ev., see.* 50, *note* 4.

3. The fourth instruction was erroneous, under the late and better American decisions, because

*First.* If there was a reasonable doubt from the testimony as to whether appellant was in such condition of mind as to act with that *deliberation* which the law renders indis-

Casat v. The State.

pensible to constitute *murder in the first degree,* then he was entitled to the benefit of that doubt. He must raise a reasonable doubt as to his sanity, and that is, if not successfully removed by the State, sufficient. 43 *N. H.,* 224; 66 *Ind.,* 94; 75 *N. Y.,* 159; 16 *Ib.,* 58; 87 *Ib.,* 377; 40 *Ill.,* 358; 56 *Miss.,* 272: 11 *Kan.,* 42; 17 *Mich.,* 23; 38 *Ib.,* 485; 4 *Neb.,* 408; 1 *Nev.,* 543; 45 *Vermont,* 308; *Oglesly v. State,* 28 *Ala.,* 18 *Wall,* 517; 1 *Sprague,* 311; 3 *Heisk.,* 354; 1 *Jere Baxter,* 178; 7 *Coldwell,* 92; 1 *Duval,* (*Ky.*) 228; 20 *Am. Law Reg.,* 720; 50 *N. H.,* 369, and

*Second.* He is entitled to the benefit of the reasonable doubt, on the question of reducing the grade of the offense, where there is proof of drunkenness, unless the proof is overcome by proof on the part of the State. 40 *Conn.,* 142; 29 *Cal.,* 678; 38 *Ill.,* 515; 2 *Duval,* 163, 2 *Parker Cr. Rep.,* 235; 43 *Tex.,* 503; 23 *Ark.,* 34: 34 *Ib.,* 344; *Willis v. Com.,* 9 *Reporter, S. C. Va.,* 1879.

4. The seventh instruction for defendant should have been given. *Bivens v. State,* 11 *Ark.,* 455; *Sweeney v. State,* 35 *Ark.,* 385; *Fitzpatrick v. State,* 37 *Ib.,* 238.

5. The testimony of Oaks and Riddle was irrelevant. *Wharton's Cr. Ev.,* sec. 50, note 4; 2 *Russ. on Crimes,* 772; 1. *Phil. Ev.,* 477; 3 *Minn.,* 262; 21 *Mich.,* 222; 4 *Eng. L. and Eq.,* 572; 7 *Iredell,* 299; 58 *Ala.,* 79; 37 *Ark.,* 262; 39 *Ib.,* 278: *Whart. Cr. Ev.,* sec. 65, 756, 29.

6. Lang was not an *impartial* juror, and the verdict should have been set aside. *Const., Art.* 2, *sec.* 10; *Busick v. State,* 10 *Ohio; Meyer v. State,* 19 *Ark.,* 156, and the witnesses for defendant who testified that Lang had expressed opinions, &c., could not be impeached by evidence of particular acts. *Gantt's Dig.,* sec. 2524; 11 *Met.* (*Mass.*) 538; 3 *Lea,* (*Tenn.*) 393; 61 *Geo.,* 305; 82 *Ill.,* 573; *Evans v. Smith,*

33

Casat v. The State.

5 *Monroe*, (*Ky.*); *Greenl. Ev.*, Vol. 1, sec. 459; 3 *Kans.*, 455, 480.

*C. B. Moore*, Att'y. Gen'l., for the State.

1. The Court properly refused the seventh instruction asked by the appellant, although a similar one was approved in 37 *Ark.*, 238. The circumstances in that case were entirely different. As modified by the Court it is more in accordance with the facts and later rulings.

2. In regard to the incompetency of the juror Lang: At Common Law motions for new trial in criminal cases were unknown, and the right is purely statutory. Can this be considered ground for a new trial under our practice? *Sec.* 1970, *Gantt's Dig.*; 19 *Ark.*, 156, 164; 20 *Ib.*, 36-50, 51; 43 *Cal.*, 147; *Wood's Dig.*, *Cal.*, sec. 1679; 17 *N. H.*, 171; 37 *Ark.*, 580. But the Court did not err in overruling the motion on this ground. *Myer v. State*, 19 *Ark.*, 164; 2 *Gra. & Wat.*, *New Trials*, 382; 2 *Wharton*, sec. 3156; 1 *Snead*, 218; 3 *Head.*, 373; 9 *Geo.*, 121; 1 *Bay*, 371; 1 *Meigs*, 263; 5 *Geo.*, 85; 9 *Cal.*, 298; *Epps v. State*, 19 *Geo.*, —; 3 *Dallas*, 517; 4 *Yerg.*, 111; 64 *Mo.*, 358; 37 *Ib.*, 343; 17 *N. H.*, 171; 12 *Geo.*, 25.

3. The fourth instruction was proper. 1 *Wheat. Cr. Law*, 711; *Whar. Cr. Ev.*, 336-7-8-9-340 and 729; 2 *Gr. Ev.*, 13th Ed., sec's. 372-3, and note 1; 2 *Bish. Cr. Pro.*, 670-1-2; *Roscoe Cr. Ev.*, 943-4. That the burden is on defendant to establish insanity by evidence fairly preponderating, is supported by the weight of authority. 63 *Ala.*, 307; 26 *Ark.*, 344; 32 *Ib.*, 218; 20 *Cal.*, 518; 24 *Ib.*, 230; 49 *Ib.*, 13; 47 *Ib.*, 134; 49 *Ib.*, 485; 31 *Ga.*, 472; 45 *Ib.*, 290-2; *Ib.*, 225; 32 *Iowa*, 50; 46 *Ib.*, 88; 48 *Ib.*, 530; 5 *Bush*, 362; 27 *La. Ann.*, 691; 57 *Me.*, 574; 7 *Gray*, 583; 7 *Met.*, (*Mass.*), 500; 2 *Minn.*, 574; *Whart. Cr. Ev.*, note 4, sec. 338; 6 *Jones, N. C.*, 366; 8 *Ib.*, 463; 35 *N. Y.*, 125; 32 *Ib.*, 147; 16 *Ib.*, 58; 52 *Ib.*, 467; 42 *N. Y.*, 1; 75 *N. Y.*, 159; 10 *Ohio St.*,

Casat v. The State.

595; 23 *Ib.*, 340; 76 *Penn. St.*, 414; 77 *Ib.*, 205; 78 *Ib.*, 122; 83 *Ib.*, 131; 86 *Ib.*, 260; 88 *Ib.*, 290; 1 *Strobb.* 479; 1 *Lead. Cr. Cases*, 111; 11 *W. Va.*, 747; 20 *Gratt*, 850; 33 *Ib.*, 807; 3 *Heiskell*, 348-370; *Gantt's Dig.*, sec. 1252; *Palmore's Case*, 29 *Ark.*; *Gantt's Dig.*, 1229 *and* 1966.

SMITH, J. The defendant was charged by indictment with the murder of George F. Barnes; was convicted of murder in the first degree, and was condemned to be hanged. In his motion for a new trial, he complained of twenty-three errors which had occured at the trial to his prejudice. Some of these exceptions are destitute of plausibility and have not been pressed in argument here.

I. Two of the assignments relate to the competency of a juror. It was alleged that before the trial Francis Lange had formed and expressed an opinion of the prisoner's guilt. Ordinarily objections of this sort come too late after verdict. Still it is possible to imagine a case, where a person who had prejudged the matter to be tried, might by concealment or prevarication impose himself upon the panel. But it ought to appear that the party complaining had availed himself of all the privileges which the law affords him for obtaining an impartial jury. The defendant in a prosecution for felony has an opportunity to examine each individual juror when he is produced touching his qualifications, and to challenge him for bias or other sufficient cause.

*1. Objections to juror too late after verdict unless, &c.*

There is nothing in the record that we have discovered outside the motion for a new trial, to show that Lange, when he was placed upon the stand to be accepted or challenged by the parties, was asked whether he had any opinion about Casat's guilt or innocence, nor upon what such opinion was founded. On the contrary there is a shade of evidence that he was not interrogated on this subject. Hence under the rule established in *Meyer v. The State*, 19 *Ark.*, 156, and *Collier v. The State*, 20 *Id.* 50, we might properly

decline to notice the point. But the Court below entered upon an investigation of the matter and received affidavits, counter-affidavits and oral testimony. The conclusion to which it came was, that Lange labored under no actual bias and that the impeaching witnesses were unworthy of credit. With that conclusion we are entirely satisfied. The Circuit Court could see what manner of people they were that testified and was in a better situation to judge whether there was any foundation for the objection than we are, who have only the record.

II. Four of the assignments relate to the reception of testimony.

Oakes, a fireman in the employment of the same railway company, in whose service Casat had formerly been, was permitted to testify that he had met Casat at Texarkana, about one month before the homicide occurred, after Casat had quit work for the Company, and when he was on his way to Texas; that Casat told him he had quit because his father had been discharged from the Company's service; that he had a good deal to say about Richardson, the master mechanic of the company, whose chief clerk the deceased was, and amongst other things remarked that he had told Richardson if ever Richardson put a black mark against him, he would come back and get even with him. This witness further deposed that he was one of the party who arrested Casat after the shooting of Barnes, and turned him over to an officer; that as he was marched off to jail, they met some boys with a gun, when Casat remarked that he had his bird, and the only thing he regretted was that he had not got the other damned son of a bitch.

Riddle testified that he saw Casat at Marshall, Texas, some ten days before Barnes was shot, when he spoke of his father's discharge; that Casat had been at work in the machine shops of a railroad company there, but told him he

Casat v. The State.

had quit that day and was going back to Little Rock that night and beat the head off of Richardson, and that Barnes was as mean a man as Richardson.

Barney Tighe swore that he was present at the killing of Barnes, and that as Casat walked past him, after the deed was done, he remarked there was one more man to die yet. The objection to the testimony of this last witness was, that it was allowed in rebuttal, where it should have been offered in chief.

<div style="text-align:right;font-size:smaller">2 CIRCUIT COURTS: Their discretion in admitting testimony.</div>

In the order of the production of evidence, the Circuit Courts are invested with a large discretion.

We shall not find fault with them in this respect, so long as they admit none but legal evidence and exclude only that which is incompetent.

The grounds of objection to the admission of the declarations made by Casat in the presence of Oakes and of Riddle were that they were irrelevant, impertinent and 'too remote in point of time to be connected with the subsequent killing. Such of these declarations as were made prior to the commission of the alleged offence, were in the nature of threats, and were admissible in proof of malice. They throw light upon the defendant's motives and the workings of his mind. Their weight would be considerably affected by nearness or remoteness of time, and by intervening conduct. *Bish. Crim. Pro.*, section 1110; *Atkins v. State*, 16 *Ark.*, 568.

<div style="text-align:right;font-size:smaller">3. Threats as evidence of malice.</div>

The subsequent declarations were extra-judicial admissions, and also tend to elucidate the springs of action. The relevancy of both classes, so far as they concern Richardson, will appear from the discussion of the next assignment.

III. This was that the verdict was contrary to evidence. All of these parties, Richardson, Barnes, Deno Casat and his father, Isadore Casat, had been servants of the St. Louis,

Iron Mount & Southern Railway. The father was station-
ary engineer at the machine shops, and the son was also
working there. The father was suspended from his func-
tions between the first and twentieth of September, 1882, for
neglect of duty and disobedience to orders. The order of
suspension emanated from Richardson, but was communi-
cated by Barnes. On the same day, or the next, the son
demanded his time and quit work. He went to Texas, but
in the latter part of October returned to Little Rock. On
the 31st of October father and son were seen drinking together
in a dram-shop in Little Rock, and the son, for the first
time in three years, went home to dinner with his father.
After that meal they separated, the old man retiring to his
bath room, where, a few minutes later, he took his own
life, and the young man crossing the river over to Argenta,
where the railroad shops were situated. At 1:35 P. M. he
came into the machine depot, inquired for Richardson, and
was informed that he was not there. At 3:10 P. M. he re-
turned and again asked for Richardson, and was told he
was up on the Knobel Branch of the railroad. He then be-
gan to curse Richardson, saying he would kill him on sight.
Barnes was at this time examining a ledger at his desk, and
Casat turned and said to him, "I believe you are the cause
of it any way," and struck him on the head with his
pistol. Barnes exclaimed, "for heaven's sake, what have I
done." At this point a locomotive engineer, who was a
friend of the Casat family, interposed and begged Deno to
stop, reminding him that there was already trouble enough
at his house, referring to the suicide of his father. Deno
said he knew it, and it was caused by the men in that office.
He recognized the engineer as a friend, but threatened to
kill him if he should interfere. He then said to Barnes,
"I guess I'll kill you any way. So get down on your knees
and acknowledge that you have done wrong." As the un-

Casat v. The State.

fortunate man was in the act of kneeling Casat shot him through the brain, and he died a few hours later. Casat left the shop and hid himself in a clump of willows down by the river bank. His hiding place was discovered and he was summoned to surrender. He held up his hands and implored his pursuers not to shoot him.

The evidence discloses a shocking murder, unrelieved by one single feature of palliation. The killing of Barnes in the manner and under the circumstances detailed above was not denied. Neither was it pretended that there was the slightest provocation for the act. But the theory of the defense was and is, that by reason of drunkenness at and before the time of the killing Casat was incapable of that deliberate intention to take human life which is the distinguishing characteristic of murder in the first degree.

*(margin:)* 4. DRUNK-ENNESS. As a defense for murder.

In a learned note to the case of *Whiteford v. Commonwealth,* 18 *Am. Dec.,* 781-2, it is said: "The state of mind of the accused, at the time of forming the purpose to kill, is the important point in determining whether the homicide is murder in the first degree or not; and it is to this that the terms "deliberation" and "premeditation" used in the statute refer. * * It necessarily results from this that it is competent for one accused of murder in the first degree to give evidence of facts tending to show that his state of mind was such as to be unfavorable to deliberation, as by proving that he was intoxicated. *Swan v. State,* 4 *Humph.,* 136; *Haile v. State* 11 *Ib.,* 154; *State v. Johnson,* 40 *Conn.,* 136; *Boswell v. Comm.,* 20 *Grat.,* 860. This is not making drunkenness an excuse or extenuation of crime; it is merely permitting the accused to show inferentially that he did not possess that condition of mind which is necessary to the commission of the crime. It is further to be observed that where the design to kill was formed deliberately, and with premeditation, the fact that the accused afterwards became

intoxicated, and was so at the time of the killing, cannot affect the degree of the homicide."

Here the jury might fairly have inferred, from the conduct and conversation of Casat, that he harbored malice and revengeful feelings against Richardson and Barnes for a supposed injury to his father; that he had meditated personal violence, if not destruction, to one or both of them, before he left Texas; and that on his return to Little Rock he had nerved himself with liquor for the deed. His utterances at Texarkana and at Marshall do not sound like the idle vaporings of a drunkard. He was sober when he made them. And they evince the settled hate and malig nity of a mind brooding over a real or fancied grievance.

But laying these declarations out of the case, the degree of drunkness that is proved falls short of that extreme point which can mitigate the enormity of his offense. The evidence does, indeed, show that on the morning of the fatal day, and for several days previous, Casat had been drinking more freely than was good for him. But this is not an unusual thing in cases of homicide. There is no evidence that the drinking had proceeded to the extent of producing any disease, either permanent, temporary or periodical, such as delirium tremens, mania-a-potu or dipsomania. So there is no proof that the ordinary effect of strong liquors was to make a mad man of him, as is its effect upon men of a certain temperament. Nor is there any cause to believe that on this particular day his reason was, by excessive indulgence, overthrown, and he no longer able to distinguish the nature and quality of his acts.

Perhaps the strongest evidence in this direction is that of the jail physician, who was called to Casat several days after his incarceration, and found him suffering from nervous excitement or prostration, which the physician attributed to dissipation, debauch and excessive use of liquors.

Even this nervousness might be explained by the abrupt cutting off of the liquor supply.

But mere nervous excitement does not go far enough to reduce the grade of the offense No voluntary intoxication can have that effect unless it is accompanied by a temporary destruction of the reason. *Shannahan v. Comm.*, 8 *Bush*, 463; *S. C.*, 8 *Am. Rep.* 465; *People v. Robinson* 1 *Parker*, *Cr. R.*, 649; *Comm. v. Hart*, 2 *Brewst.*, 546; *Pennsylvania v. McFall*, 1 *Add.*, 255.

If the inebriate's memory has not been impaired, or his judgment perverted; if his physical senses, and especially his sight and hearing, have not become enfeebled or distorted; if he walks with a firm, elastic step; if he can distinguish friend from foe, and knows the difference between right and wrong, then he retains mind enough to plan and execute a murder.

Now while Casat may have been partially drunk when he killed Barnes, yet he was not in such a besotted condition as not to know what he was doing, or that it was wrong. The facts that he hid himself and begged his life of his captors, show that he was conscious that his act was un-lawful, or at the least, that it was one which he ought not to do. But aside from this, we have the ordinary evidences of deliberation—previous threats, preparation of a weapon, patient search for the intended victim, absence of provoca-tion, dangerous nature of the instrument of death, and the manner of using it. The eye-witnesses of the final scene are unanimous that he was remarkably cool and collected, until he lashed himself into fury by the abuse of Richardson. He did not stagger like a drunken man, but his tread was quick and active.

IV. We come now to the charge of the Court. Seven special requests were granted at the instance of the State, five at the instance of the defendant, and the Court gave an

elaborate charge of its own. The bill of exceptions docs not show that any exceptions were reserved to the general charge. But if any had been taken, it was, considered in connection with the special instructions, a correct exposition of the law of murder, as applicable to the facts in proof. It defined murder, explained the difference between the two degrees of that crime, and instructed them in plain English as to what ingredients must enter into the act to make the highest degree. It reminded them that the accused started out clothed with the presumption of innocence, and that this presumption attended him throughout the trial, and could only be broken down by proof convincing their minds, beyond a reasonable doubt, of his guilt. That whether the offense was murder in the first or second degree depended upon all the circumstances, and particularly upon the state of his mind at the precise time of the killing, and whether he knew what he was doing and that it was wrong. That they might consider the fact of drunkeness in determining the intent with which the act was done, and the degree of the crime; and if he was so drunk as to be unable to form a specific intent to kill, then he was not guilty of murder in the first degree.

5. Insanity as a defense for crime. Most of the matters involved in the defendant's exceptions have been disposed of by what we have already said. But there was one instruction which has been much discussed here. It was in these words:

Burden and degree of proof. "The killing being proved, it devolved upon the accused to prove by testimony fairly preponderating, that he was in such a condition at the precise time the deed was done, as not to know the consequence of his act, and not to know right from wrong; unless the testimony on the part of the State show that he was in such condition."

This seems to be in accord with *Sec.* 1252 *of Gantt's Digest:* "The killing being proved, the burden of proving cir-

cumstances of mitigation that justify or excuse the homicide shall devolve on the accused, unless by the proof on the part of the prosecution, it is sufficiently manifest that the offense only amounted to manslaughter, or that the accused was justified or excused in committing the homicide."

The instruction also follows *McKenzie v. State*, 26 *Ark.*, 334.

It was the rule of the common law that the defendant who relied upon the plea of insanity as an excuse for crime must prove it as an independent fact. 1 *Wharton Cr. Law, sec.* 711, *and cases cited;* 2 *Bish., of Cr. Pro., sec.* 672.

This is still the law of England, as may be seen by reference to *M. Naghten's Case*, 10 *Clark & Fin.*, 200. There the House of Lords propounded to the Judges a question as to what instructions should be given to the jury, on the trial of a prisoner charged with crime, when unsoundness of mind is interposed as a defense. The answer was, that the jurors ought to be told that "it must be clearly proved that at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or if he did know it, that he was ignorant he was doing what was wrong."

This doctrine is also supported by the decided weight of American authority. We are aware that several respectable courts have held that the prosecution must prove sanity beyond a reasonable doubt; while another line of cases have gone to the opposite extremity and have declared that it is incumbent on the defendant to establish insanity beyond a reasonable doubt.

Of course the same test of responsibility for criminal acts applies when the alleged incapacity to commit the particular crime proceeds from drunkenness as when it proceeds from insane delusion. *State v. Johnson*, 40 *Conn.,* 136; *Wood v. State*, 34 *Ark.*, 341; *U. S. v. Roudenbush*, 1 *Bald.*, 517.

Casat v. The State

6 MUR-
DER.
Delibera-
tion: When
it must ex-
ist to con-
stitute
murder in
the first de-
gree.
The defendant also moved this instruction: "Unless the jury find from the evidence the specific intent to take life, that it was formed beforehand and carried out *with* delibera-tion, they must acquit the defendant of murder in the first degree."

This the Court modified by substituting the word 'after' in place of 'with' before deliberation. In *Fitzpatrick v. State*, 37 *Ark.*, 256, an instruction in the precise language of the defendant's prayer was approved by this Court. But we prefer the modification as a more accurate expression of the law and less liable to mislead. If the resolve to kill was formed deliberately and with premeditation, it could not re-duce the grade of the offense that, at the time of the execu-tion of his purpose, the defendant was in a passion, or labor-ing under excitement. *State v. Garrand*, 5 *Oregon*, 216.

There is no error in the record and the judgment is af-firmed.

### DISSENTING OPINION BY

EAKIN, J. I make no question, in this case, of the suf-ficiency of the evidence to support the verdict, and think the instructions, *taken as a whole*, might, by nice reasoning, be reconciled with the view of the law, which, in the conflict of decisions, accords best with general principles. But they are so divided and separately presented that there may be reason to fear that they were misapprehended by the jury; and they are approved by the Court as expressing views in which I fail to concur.

I think in all crimes, wherein mental capacity or mental conditions, form an element of guilt or innocence, that these mental powers or conditions are involved in the sole issue of guilt or innocence; and the same rules apply to their proof, and the degree of proof, as do to any other essential elements of the crime; and that if, as to them, the proof be such as to leave the minds of the jury in a state of reasonable doubt as

to whether the defendant was or not in the condition to be able to commit the crime, in the degree charged, he should be acquitted of that degree. The fourth instruction seems to militate against that conclusion, and to hold the defendant liable to the highest degree of crime which would attach to the act if committed by a sane, cool person, unless he should show, by *preponderating* evidence, his mental condition to have been such as to incapacitate him for it. 'That means to say, that whilst the prisoner is entitled to the benefit of a reasonable doubt as to every other element of the crime save mental capacity, he is not as to this; but must prove the incapacity, not only by evidence sufficient to raise a reasonable doubt, (which is proper), but by evidence actually preponderating in the minds of the jury. This position is supported by a line of authorities very numerous and respectable, and has some countenance in one of the decisions of this Court. His Honor, the Circuit Judge, did not feel warranted in departing from it, but I think the occasion now presented to reconsider the matter, enables me to say with propriety, that I do not think the position logical or in conformity with the general principles of criminal law. There is a line of authorities *per contra*, perhaps not so numerous, but entitled to the highest respect, to say nothing of the views of Mr. Wharton upon this point, in which I concur.

In estimating the *degrees* of murder, intoxication may be shown to repel the idea that the murder was committed with that degree of *deliberation* essential to the commission of murder in the first degree, as distinct from murder in the second —not to *excuse* the crime, but to show that the crime, in that degree, has not been committed. To the limited extent in which intoxication is admissible, it stands on the same grounds with other mental incapacity, generally called insanity. The *onus* of proof is confessedly on the defendant, in either case, to show the incapacity.

The question is not as to the *onus*. It is as to the degree and strength of the proof. We must distinguish between civil and criminal cases in the use of this word *onus*. In the former, wherever it rests, it must be sustained by *preponderating*-evidence. In criminal cases another principle intervenes—the principle of reasonable doubt. Wherever that exists, or in whatever essential element of crime, it is fatal to conviction.' It renders it impossible, equally when raised by the State, or by the prisoner. The issue is a single one of guilty or not guilty. The State making a *prima facie* case throws the *onus* of proof in exculpation, such, for instance, as of mental incapacity. *Onus* means the necessity of proof. But owing to the peculiar nature of criminal cases, and the doctrine of doubt, the *onus* is sustained by proof sufficient to make on the minds of the jury a fair and reasonable impression of doubt, otherwise the cautious and beneficent doctrine of doubt, will be much limited in its application, upon distinctions founded upon no good reason.

When the common law and our statutes speak of the burden of proof on the prisoner in criminal cases, I conceive them to mean burden in this sense, and not in the sense of requiring preponderating evidence. After all, with due deference to the high courts and eminent jurists who have maintained the doctrine, is there not something absurd and illogical in saying that the jury must not convict any man of whose guilt they have a reasonable doubt, except the doubt be as to whether he was so unfortunate as to be incapable of guilt, but a doubt on that point must not save him. It would be ludicrous, if it were not so serious, to hang a man, notwithstanding the doubt, for the safety of society.

Murder, in a general sense, means murder in the second degree. It is this degree to which the common law definition applies. The crime of murder in the first degree is exceptional and of American creation. It resulted from the

abolition of capital punishment, or the desire to abolish it, in ordinary cases, after the institution of penitentiaries, with the feeling that it would not be safe to do so in the case of wretches capable of perpetrating murder with deliberation under circumstances of atrocity.   Hence the legislatures elevated these murders out of the general class, and the result has been that the higher crime must be shown by the State. The *onus* is on the State, not only to show murder by direct evidence of malice, or by circumstances from which it would be presumed—but, if it seeks a conviction in the first degree, to show also that it was wilful and *deliberate.*   If facts are then shown which would ordinarily indicate deliberation, the State has made out the higher degree of guilt, unless the prisoner in response or explanation should show circumstances or facts sufficient to raise a reasonable doubt as to whether or not there was deliberation.   But if he does raise that doubt, why shall he be deprived of the benefit of it as to the degrees of crime?   Can we, without abandoning the doctrine of doubt, insist that he shall do it by preponderating evidence?

There is proof in this case sufficient to have justified the jury in finding such a degree of intoxication, as, connected with his father's suicide, would have authorized a doubt as to whether or not he was in a condition of mind compatible with deliberation.   It was all, really, for which his counsel contended.   The murder was unquestioned, and it was a sad and shocking one.   But if it were the result of excitement and sudden determination in the mind of one incapable of deliberate thought, it would still, being murder from that amount of premeditation, not be murder in the first degree; as contemplated by the statute.   I think the instruction, though general in its terms, and not specially directed to this point, is not correct in the abstract, and may, *in connection with the line of defense,* have been under-

stood by the jury to mean that they could not find murder in the second degree, unless the evidence of the mental incapacity were preponderating.

I have not cited the line of authorities sustaining the views I have taken. The bar, since Guiteau's case, are familiar with the three lines of decisions, upon this much mooted question, and they may be found arranged in the recent editions of the text books on criminal law and evidence.

Whilst I think it commendable in the Circuit Judge to have followed what seemed to him the previous rulings of the Court, I would be pleased to have had the concurrence of my associates in laying down the rule differently for the future. Failing in this, and conceeding that they are supported by high authority, I, nevertheless, feeling that I am supported by equal authority, and better reasoning, respectfully dissent.